Ellis CAMPBELL, Jr., District Director of Internal Revenue, Appellant,

v.

J. M. EASTLAND and Montez Eastland, Appellees.

No. 19057.

United States Court of Appeals Fifth Circuit.

July 23, 1962.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Joe Tunnell, U. S. Atty., Tyler, Tex., Meyer Rothwacks, Myron C. Baum, Harold C. Wilkenfeld, Attys., Dept. of Justice, Washington, D. C., Wm. Wayne Justice, U. S. Atty., Lloyd W. Perkins, Asst. U. S. Atty., for appellant.

Allen E. Pye, E. Taylor Moore, Tyler, Tex., for appellees.

Before BROWN, WISDOM, and BELL, Circuit Judges.

WISDOM, Circuit Judge.

This civil action for a tax refund is tied in a tight knot with a criminal prosecution for fraud.[1] With patience some formidable knots may be untangled. A famous one was cut. Here, the trial judge attempted to cut away the criminal strand. We think that it would have been better to have waited and then patiently untangled the knot.

The controversy swirls around discovery. The plaintiffs moved to require the District Director of Internal Revenue to produce reports of agents who had investigated the plaintiffs for tax fraud. The reports were in the United States Attorney's criminal files. No assessment for deficiencies had been made. The Director asked for a stay of the motion in order to allow the criminal case to be disposed of first. He contended that the reports were privileged; that the motion for discovery was a cover-up to allow the taxpayers to inspect criminal files for information not available to them before the trial of the criminal case and then available only under the strict rules of criminal procedure and the "Jencks" Act, 18 U.S.C.A. § 3500. The trial judge held that the civil action was independent of any criminal action. He granted the taxpayer's

motion, struck the defendant's answer and, without hearing any evidence in support of the complaint, gave judgment for the amount of the refund claimed, plus interest and costs. Rule 34, F.R. Civ.P., 28 U.S.C.A., allows discovery of documents only by court order "upon motion of any party showing good cause therefor". Our decision turns on the facts bearing on good cause. We reverse and remand.

I.

The nature of the case requires a detailed review of the facts and proceedings below.

J. M. Eastland[2] operates a chain of five and ten cent stores in Texas and Oklahoma. He and his wife filed a joint tax return for 1957 in which they declared an operating loss exceeding their income for that year. The loss would result in eliminating their tax liability for 1955, if the loss were carried back to that year under the loss carryback provisions of Section 172 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 172. March 29, 1958, the Eastlands filed a claim for refund of all of the income taxes originally paid for 1955. April 1, 1959, an Internal Revenue Agent commenced an examination of the taxpayer's books and records for the purpose of determining the correct income tax liability for the years 1955 and 1957. Two weeks later, two Special Agents began an investigation of the tax results. An investigation by Special Agents is a well-known storm warning to the taxpayer that he is being investigated for tax fraud. January 25, 1960, the agents completed an investigation of the taxpayer for alleged evasion of income taxes. They recommended that criminal proceedings be brought for tax evasion for the years 1955, 1956, and 1957. The District Director forwarded

---

1. J. M. Eastland was indicted May 16, 1961. The case went to trial September 5, 1961. September 8, 1961, he entered a plea of guilty to one count.

2. The complaint was filed on behalf of both Mr. and Mrs. Eastland. We refer to the taxpayers in the singular, since J. M. Eastland is the sole taxpayer in the criminal proceeding and the principal taxpayer in the civil proceeding.

the files to the Department of Justice and, after a reasonable time, the Department concluded that the taxpayer should be indicted for wilful attempt to evade his income tax as reflected by the following amounts:

| Year | Taxes Reported | Taxes Corrected | Taxes Attempted To Be Evaded |
|---|---|---|---|
| 1955 | $3,192.24 | $21,487.51 | $18,295.27 |
| 1956 | 7,746.93 | 22,894.95 | 15,148.02 |
| 1957 | 0 | 4,347.97 | 4,347.97 |

———◆———

June 20, 1960, the Department of Justice forwarded the case to the United States Attorney for the *Eastern* District of Texas and instructed him to institute criminal proceedings against the taxpayer.

About the middle of June 1960 the taxpayer's attorney, Mr. Allen Pye, got in touch with Mr. Paul Brown, then United States Attorney for the Eastern District of Texas, and inquired if the Eastland file was "in the office for consideration for criminal prosecution". At that time the file had not been returned from the Department of Justice. Later, in the hearing on the motion for discovery, Mr. Brown testified that Mr. Pye "asked that when it was received and before the matter was presented to the Grand Jury, in the event we decided to present it to the Grand Jury, that he be given an opportunity to discuss the matter with me, and indicated at that time that there might be a plea of guilty", although Mr. Pye made no firm commitment as to such a plea. After the file came into the office June 27, 1960, Mr. Pye had two or three telephone conversations with the United States Attorney as to when the case would be presented to the grand jury. December 16 Mr. Brown and his successor, Mr. Tunnell, had a conversation with Mr. E. T. Moore, another of the taxpayer's attorneys, in the course of which Mr. Brown called Mr. Pye, and informed him that the case was being prepared for submission to the grand jury January 3, 1961, in Beaumont. He made an appointment with the taxpayer's attorneys for the following day. At this conference, the two United States Attorneys "anticipated that the discussion would be about a plea of guilty". The taxpayer's attorney, however, said that "he was firmly convinced of Eastland's innocence" and felt that "if the United States Attorneys would go into the file more thoroughly" they would agree. Mr. Tunnell, the incoming United States Attorney, then agreed to "defer presenting it to the Grand Jury so that he could do just what Mr. Moore had asked him to do".

December 5, 1960, the Eastlands instituted an action in the *Northern* District of Texas for the tax refund claimed for 1955. Mr. Brown testified at the hearing on the discovery motion that notwithstanding this recent filing—just ten days before Mr. Moore's conference with the United States Attorneys for the Eastern District—Mr. Moore did not "at that time or any time, mention the fact that [the taxpayer] had filed a civil action". Mr. Tunnell also testified that there was no conversation relative to a civil action. In response to repeated questions from Mr. Moore, he said: "We were talking about whether this case was going to be submitted to a grand jury or not * * * I was not aware of your connection or anybody's else's connection with any civil action in this case." Mr. Tunnell, as the new United States Attorney, agreed to give the case the study suggested and to make an independent judgment on it. This would

require deferring presentation of the case to the grand jury until it met again in March. This testimony underscores the fact that the taxpayer's attorneys in their dealings with the United States Attorney's office were interested only in the criminal case then about to be submitted to the grand jury. At the hearing Mr. Moore contradicted the testimony of the two United States Attorneys. He stated that at the outset of his conference he "told them that [he] had filed a civil action; that settling the civil liability was highly important."

The District Director filed his answer in the civil suit January 31, 1961, denying that a refund was due. He neither counterclaimed nor pleaded any affirmative defense. The answer contains no reference to any deficiency. *The taxpayer had not paid any deficiency; the tax deficiency had not even been assessed.*

February 13, 1961, the taxpayer filed a motion under Rule 34 for discovery. There was no pre-trial conference; the case was months and months distant from trial. The taxpayer asked for production of the following documents:

"1. 'Any and all' reports of the Special Agents or of any other employee of the Internal Revenue Service made with respect to the examination of the taxpayers' returns for the years 1954 through 1957.

"2. 'Any and all' written statements taken under oath by any agent or employee of the Service.

"3. 'Any and all' written statements and documents received from certain employees of the taxpayers.

"4. 'Any and all' documents pertaining to the failure of defendant to act upon the claim for refund."

The affidavit attached to the motion to produce asserted that the several taxable years were interrelated, because an adjustment in one year might affect the tax liability for every year at issue.

February 21, 1961, the District Director filed an answer stating:

"That said files and documents in the custody of the United States Attorney for the Eastern District of Texas in connection with a criminal proceeding are privileged except as they might be ordered produced under the holding of Jencks v. U. S., 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103 or Title 18, U.S.C., Section 3500, relating to production of documents in criminal cases."

The answer pointed out that the case, having been recently filed, "is not set for trial, and in the normal sequence of events would not be reached for trial for several months". In addition, the Director asserted:

"Tax refund suits such as this case are handled by attorneys from the Department of Justice, and since the filing of this motion on February 14, 1961, said attorneys have not had time to prepare an answer to said motion on the merits, or to come to Dallas for a hearing on the merits."

Accordingly, the defendant prayed for a stay of proceedings pending disposition of the criminal case.

The motion was filed in the District Court for the Northern District of Texas. That court transferred the action to the Eastern District of Texas.

March 21, 1961, a hearing was held on the taxpayer's motion to produce. We have previously referred to some of the testimony. The United States Attorney repeated his request for a delay in producing the submission of the criminal case to the grand jury. He and his predecessor testified, as noted, that in discussions with the taxpayer's counsel there had been no mention of a civil suit for a refund; the taxpayer was interested in the criminal action only. On the record, the United States Attorneys, although contradicted by one of the taxpayer's attorneys, made a good case for the point that the criminal action was more important than the civil action, even in the minds of the taxpayer's counsel.

It is a fair inference from the record that the filing of the suit for a refund, or at least the filing of the motion for discovery, was a tactical maneuver to enable the taxpayer to gain advance information on the criminal case. The trial judge himself entertained no doubts as to the motivation for discovery. During the hearing he asked one of the taxpayer's attorneys:

*"What is the materiality of this stuff you want, except, to be honest about it, you want to see about your defenses in a criminal case?"*

In spite of this well-grounded suspicion, the trial judge concluded that if the civil suit were bona fide, it should be kept so independent of the criminal action that the criminal action should be ignored. This is the fatal defect in the proceedings below. The trial judge adopted the strict view that there "is nothing in this statute that exempts the operation of Rule 34 in a civil case by virtue of the fact that there might be a criminal case pending or a potential criminal case." He said:

"I will say this: The argument about there being a potential criminal case or not, as made by the Government, doesn't appeal to me. It's a matter of materiality here as to whether or not I should let you look at the matters; because if this is a bona fide civil suit, then the rules of civil procedure govern it; and if it falls within Rule 34, then you are entitled to have those documents produced—I don't care whether a criminal action is pending or whether the Government wants to bring one or what."

On the materiality of the requested reports, the court was persuaded by the taxpayer's argument that a suit for refund based on an operating loss carry-back in effect puts in issue each item of income, deduction, and credit both in the year of loss and the years when the loss is carried; that here, the taxpayer could not be certain what adjustments the Government proposed to make and what issues the Government might raise.

After announcing his decision to grant the motion the trial judge remarked, apparently acknowledging the existence of a serious legal question, "I assume that the Government is going to refuse to let [the taxpayer] see [the records]". March 21, 1961, the trial judge entered an order directing that all the requested documents be produced at 2:00 P.M. the next day.

March 22, 1961, the District Director served a notice to take the deposition of the taxpayer on March 30, 1961. At the same time he filed a "Motion to Stay Order to Produce Pending Plaintiff's Compliance with Notice of Taking Deposion and Plaintiff's Giving Testimony". This motion alleged that the discovery order would require disclosure of the criminal file, that the Director anticipated Mr. Eastland would exercise his privilege against self-incrimination by refusing to reply to questions, that if this proved to be the case the District Director ought not to be compelled to comply with the Order to Produce. The taxpayer filed no answer to this Motion to Stay. The court summarily denied the motion the same day it was filed.

March 23, 1961, the taxpayer filed a Motion to Dismiss, moving that the court, "under Rule 37 of the Federal Rules of Civil Procedure, enter an order dismissing this action with prejudice; that judgment be entered with costs for the defendant; and for such other and further relief as the Court may deem proper". The motion recited "as a basis for the relief" the refusal of the United States Attorney to comply with the Order to Produce, because of his being "under order from Mr. Fred Folsom of the Criminal Division of the Department of Justice not to comply with the court's order". The District Director's response was that he had no objection to dismissal of the complaint without prejudice to the rights of either party, or to dismissal with prejudice "provided that it is clearly understood that such action does not

prejudice the United States with respect to any claim it may have against these plaintiffs."

At the hearing March 24, naturally enough, the trial judge was in doubt as to the reason for such a motion. The taxpayer's attorney stated that the reason was to cut off the Government's "tremendous counterclaim". This was the colloquy:

"The Court: * * * I can't see how dismissing this lawsuit with prejudice would settle your tax liability for 1955.

"Mr. Pye: Well, we want this judgment, of course, to cut off any right of counterclaim—to cut off any counterclaims or cross-actions that they may have against this Plaintiff; in other words, to settle this tax liability for 1955. It's the type of thing that we might end up settling it that way anyway; but under the circumstances we now find ourselves in, why, *we felt that this would be the best way to settle it.*

"This settles it as far as he is concerned, Your Honor. *He doesn't have to worry about a tremendous counterclaim;* whether it has good basis for it or not. And when are they going to bring it, if they are going to bring it."

Then, and no doubt to the surprise of even the taxpayer's attorney, whose motion had not asked for such action, the trial judge came up with the idea:

"Why wouldn't the proper thing be for the Court to strike their Answer in this case and enter judgment for the full amount of your suit?"

In reply, the United States Attorney stated, in part:

"I think the Court understands that I do not stand in defiance of this Court. I respectfully decline on the grounds asserted in this Order. I must assume responsibility for it, notwithstanding direction from higher officials, because the records are in my custody.

"But, I would pray the Court that no such harsh remedy be exercised against the United States Government that it could not later stand on the merits of any lawsuit—civil or criminal—that might be before the Court—and stand or fall with the merits of the case without regard to any wrongdoing upon the part of any agent of the Government that is personal in nature."

The Court held:

"Therefore, the Court thinks it is most ill-becoming of any party, and particularly an agency of the Government of the United States, not to obey a lawful order of the Court.

"Now, the Court feels that this is a lawful order. If it didn't, it never would have entered the order. And, therefore, I think that as drastic steps as are permitted under Rule 37 should be taken against the Government in this case; with the exception of I'm not going to put the United States Attorney or his Assistant in jail.

"I am not going to put Mr. Campbell in jail.

"If the Court were inclined to put anybody in jail it would be that man up in Washington that told you to disobey this Order.

"But now, of course, the Court has assumed at all times that the Plaintiffs filed this suit for refund in good faith. And I am not here disposed to do anything as to any criminal action that the Government might bring against them. That's independent.

"However, on the other hand, I will do such as I think I can do under this Rule 37 to prohibit the Government from asserting any civil liability against them."

*Without hearing any evidence in support of the complaint,* the district court entered a judgment March 25, 1961, denying the taxpayer's motion to dismiss, striking the District Director's answer

from the record, and decreeing that the taxpayer receive the full amount claimed, $3,066.24, with interest and costs.

## II.

In general, we agree with the view expressed by William D. Mitchell, former Attorney General, Chairman of the Advisory Committee that drafted the Federal Rules of Civil Procedure, in a statement often quoted:

"It ought not to be necessary to resort to discovery against the Government * * * [for] the Government litigates with its citizens and ought to be frank and fair and disclose all the facts." [3]

There are times however when the Government, *because it is the Government*, must withhold or postpone full disclosure. This is such a time.

A. In a mine-run civil case the discovery provisions of the Federal Rules of Civil Procedure apply to claims against the Government,[4] and courts have imposed sanctions upon the Government for disobeying orders to allow discovery.[5] Usually, when the taxpayer is seeking a refund or resisting payment of a tax deficiency assessed against him the United States is just another litigant. In such cases we start with the feeling that fundamental fairness to both sides —the Government starts with a great advantage in investigative resources—requires recognition of the taxpayer's right to pre-trial discovery of the reports of the Internal Revenue Agents who examined the taxpayer's books and records.

■ However, all discovery rules exempt privileged matter.[6] In the district court the Director first relied primarily on Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and the "Jencks" Act, 18 U.S.C.A. § 3500.[7] In the argument below and be-

3. Federal Rules of Civil Procedure, Proceedings of the Institute at Washington, D. C., Oct. 6, 7, 8, 1938.

4. See 2A Barron and Holtzoff, Federal Practice and Procedure (Wright's Ed. 1961) § 651.1; 4 Moore, Federal Practice (1950) § 26.25. See also Berger and Krash, Government Immunity from Discovery, 59 Yale L.J. 1451 (1950); Developments in the Law-Discovery, 74 Harv.L.Rev. 940, 988, 1033–1042, 1051 (1961); Porter, Discovery Against the Government, 6 Prac.Lawyer 61 (1960); MacAsbell and Snell, Scope of Discovery Against the United States, 7 Vand. L.Rev. 582 (1954); Miller, Availability and Use of Non-Public Government Records and Reports in Civil Litigation, 9 Syr.L.Rev. 163 (1958); Carrow, Government Non-disclosure in Judicial Proceedings, 107 U.Pa.L.Rev. 166 (1958); Note, Remedies Against the United States and Its Officials, 70 Harv.L.Rev. 827, 934–38 (1957); Speck, The Use of Discovery in United States District Courts, 60 Yale L.J. 1132 (1951).

5. United States v. Procter & Gamble, 1958, 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed. 1077; United States v. Cotton Valley Operators Comm., W.D.La., 1949, 9 F.R.D. 719, aff'd by an equally divided Court, 1950, 339 U.S. 940, 70 S.Ct. 793, 94 L. Ed. 1356; O'Neill v. United States, E.D. Pa., 1948, 79 F.Supp. 827 rev'd on other grounds sub nom. Alltmont v. United States, 3d Cir. 1949, 174 F.2d 931; Mitchell v. Bass, 8 Cir., 1958, 252 F.2d 513.

6. The privileges to which Rule 34 refers are common law, evidentiary privileges. United States v. Reynolds, 1935, 345 U.S. 1, 6, 73 S.Ct. 528, 97 L.Ed. 727.

7. 18 U.S.C.A. § 3500 (P.L. 85–269, 71 Stat. 595), in part, provides:
"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
* * * * *

fore this Court the Director took a broader position. He argues that considerations of public policy should prevail in order to prevent the civil discovery rules being subverted into a device for improperly obtaining discovery in the criminal proceedings. He argues that reports, especially the reports of the special agents (whose function is to investigate criminal aspects) necessarily include material protected by executive privilege and the works-product doctrine; and probably includes material protected from disclosure by the informer's privilege.

■■■■ (a) We do not know what material in the files may happen to be protected by the informer's privilege.[8] If there were any such material, it should have been protected by an appropriate exception to the order. (b) Executive privilege is narrowly confined to matters affecting the national security, such as military and state secrets. It may not be invoked lightly.[9] "There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." United States v. Reynolds, 1953, 345 U.S. 1, 7, 73 S.Ct. 528, 532, 97 L.Ed. 27. There is no basis here for the claim of executive privilege.[10] (c) The "Jencks" Act, 18 U.S.C.A. § 3500, applies only to discovery in a criminal prosecution. It is important and relevant here with respect to good cause, because of the interrelation between the criminal proceeding which was about to be instituted and the case before us. (d) We would think that some of the reports or portions of the reports must come within the scope of the work-products doctrine.[11] See United States v. Woodner, S.D.N.Y., 1959, 24 F.R.D. 33. To obtain discovery of work-products, there must be an unusually strong showing of good cause to justify discovery of such writings; they are not absolutely privileged. Hickman v. Taylor, 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. The District Director, however, has never claimed absolute privilege; he has asked only that discovery be postponed. The real issue, therefore, is whether there was good cause for the order when and as it was issued.

B. What constitutes good cause varies from case to case. Two circumstances distinguish the situation here from the mine-run situation in discovery against the Government: (1) the interrelation of the civil action with the criminal action and (2) the absence of a deficiency assessment.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

"[T]he legislative history makes clear, the Jencks Act 'reaffirms' [the Supreme Court's] holding in Jencks v. United States, 353 U.S. 657, [77 S.Ct. 1007, 1 L.Ed.2d 1103] * * *. The command of the statute is thus designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian." Campbell v. United States, 1961, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428. See also Clancy v. United States, 1961, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574.

8. The answer to the motion to produce does not allege that there was any matter protected by the informer's privilege. The appellant's brief, however, takes it for granted that discovery in this case would give access to the identity of informers and to information which they furnished the Government.

9. Kramer and Marcuse, Executive Privilege —A Study of the Period 1953–1960, 29 Geo.Wash.L.Rev. 623, 827 (1961).

10. The Government points out that only three days elapsed between entry of the order to produce and entry of judgment against the District Director; that therefore the Director did not have time to prepare a *formal* claim of executive privilege.

11. Tolman, Discovery Under the Federal Rules: Production of Documents and the Work Product of the Lawyer. 58 Col.L. Rev. 498 (1958); Comment, Developments in the Law—Discovery, 74 Harv. L.Rev. 940, 1027–1046 (1961).

■ (1) There is a clear-cut distinction between private interests in civil litigation and the public interest in a criminal prosecution, between a civil trial and a criminal trial, and between the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure. But these distinctions do not mean that a civil action and a criminal action involving the same parties and some of the same issues are so unrelated that in determining good cause for discovery in the civil suit, a determination that requires the weighing of effects, the trial judge in the civil proceeding should ignore the effect discovery would have on a criminal proceeding that is pending or just about to be brought. The very fact that there is a clear distinction between civil and criminal actions requires a government policy determination of priority: which case should be tried first. Administrative policy gives priority to the public interest in law enforcement. This seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities.

■ In handling motions for a stay of a civil suit until the disposition of a criminal prosecution on related matters and in ruling on motions under the civil discovery procedures, a judge should be sensitive to the difference in the rules of discovery in civil and criminal cases. While the Federal Rules of Civil Procedure have provided a well-stocked battery of discovery procedures, the rules governing criminal discovery are far more restrictive. Compare Rules 26 through 37, Fed.R.Civ.P., 28 U.S.C.A. with Rules 15, 16, and 17, Fed.R.Crim. P., 18 U.S.C.A. Separate policies and objectives support these different rules.[12]

Rule 16, Fed.R.Crim.P., the counterpart of civil Rule 34, limits discovery of documents and objects to those "obtained from or belonging to the defendant or obtained from others by seizure or by process". And 18 U.S.C.A. § 3500 does away with any pre-trial discovery of statements of a government witness. A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal suit. Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other. In some situations it may be appropriate to stay the civil proceeding. United States v. Bridges, N.D.Calif., 1949, 86 F.Supp. 931. In others it may be preferable for the civil suit to proceed—unstayed. In the proper case the trial judge should use his discretion to narrow the range of discovery. Here, however, the trial judge seemed to think that he had no discretion—once discovery was moved for in a civil suit.

A taxpayer about to be indicted for fraud carries a heavy burden when he asks to inspect the Government's criminal

12. "Traditionally, the narrow scope of discovery in criminal litigation is justified by three considerations which are said to be peculiar to criminal law. First, there has been a fear that broad disclosure of the essentials of the prosecution's case would result in perjury and manufactured evidence. Second, it is supposed that revealing the identity of confidential government informants would create the opportunity for intimidation of prospective witnesses and would discourage the giving of information to the government. Finally, it is argued·that since the self-incrimination privilege would effectively block any attempts to discover from the defendant, he would retain the opportunity to surprise the prosecution whereas the state would be unable to obtain additional facts. This procedural advantage over the prosecution is thought to be undesirable in light of the defendant's existing advantages. The validity of each of these objections must be appraised in each of the situations in which the defendant may seek discovery and must be weighed against the importance to the defendant of the disclosure." Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1052 (1961).

files containing reports especially prepared with criminal prosecution in mind. We are not talking about some vague suspicions that might in the future lead to a criminal charge. We are talking about a case the Department of Justice has decided should be instituted, and one that would have been submitted to the grand jury but for the urgent pleas of the taxpayer. The possibility of criminal prosecution was no news to the taxpayer; during 1959 the presence of the Special Agents put the taxpayer on notice. On the facts, the trial judge found—or expressed the opinion—that "to be honest about it" the purpose of the discovery was "to see about [the] defenses in a criminal case". There the proceedings should have ended, with dismissal of the motion or a stay of the proceedings.

Instead, the trial judge held that the suit for refund was a bona fide suit, and as such, it was completely "independent" of the criminal case. If a taxpayer files suit in bad faith, it is an abuse of process; but his good faith on a suit for refund does not sanctify the motion for discovery. We take the view that whether or not the suit, as distinguished from the motion, was bona fide, the effect of granting the motion was to give pre-trial discovery of documents denied the taxpayer in the criminal case. The order nullified the effect of section 3500. It was an open invitation to taxpayers under criminal investigation to subvert the civil rules into a device for obtaining pre-trial discovery against the Government in criminal proceedings.

(2) The District Director's motion to stay was based, in part, on the administrative policy against asserting tax deficiencies before development of the criminal case. At such time, after the criminal case had progressed, the issues would be clarified and the assessment of deficiencies would be a factor in considering a limited and timely discovery. At that time the taxpayer might more appropriately argue that it is the Internal Revenue Agents' knowledge of the particular aspects of the taxpayer's business which he is entitled to discover in order to have an understanding of the reason for the deficiency assessment; here, the argument was premature.

The taxpayers filed a complaint based on their own knowledge of their financial affairs. They had all the knowledge they needed for purposes of proving their case. In effect, they asked for information on a counterclaim the defendant had not asserted.

These facts distinguish the case from Frazier v. Phinney, S.D.Tex., 1959, 24 F.R.D. 406 [13] and Commissioner v. Licavoli, 6 Cir., 1958, 252 F.2d 268. In those cases the civil action was the direct result of a tax deficiency; the District Director refused to give the taxpayers any information whatsoever concerning the basis of the deficiencies and penalties assessed against him. To the extent that this opinion differs from the opinions in Frazier v. Phinney and Commissioner v. Licavoli, we disapprove of those decisions. In Frazier v. Phinney the court said:

"By assessing and collecting the alleged income tax deficiencies, penalties, and interest, defendant laid the necessary basis upon which plaintiffs could invoke the jurisdiction of this court. If defendant had not assessed and collected such amounts, he might contend that this court did not have jurisdiction and might refuse to discuss the basis for such

13. "This is apparently the first reported case in which a taxpayer has secured the revenue agent's report. The fact that the district director refused to give the taxpayer any information whatsoever concerning the basis of the deficiencies and penalties assessed against him, gave him such a strong argument for production that it becomes difficult to evaluate the decision as precedent for future litigation in which the taxpayer may have more information but additional knowledge of the basis of the government's claims would aid his case." Note, 29 U.Cinn. 270, 271 (1960). Cf. Harrigan & Sons, Inc. v. Enterprise Animal Oil Co., Inc., D. C., 14 F.R.D. 333 and National Discount Corp. v. Holzbaugh, D. C., 13 F.R.D. 236 in which the accused sought to avoid discovery.

alleged tax deficiencies until all criminal actions related there to have been disposed of. But by permitting plaintiffs to obtain the jurisdiction of this court, defendant gave them the right to proceed expeditiously with the adjudication of their tax liability and to use all discovery procedures permitted by the Federal Rules of Civil Procedure. Thus defendant cannot deny plaintiffs access to the requested agents' reports solely on the ground that they might obtain information and Government evidence intended for use in a pending criminal action. This motion for production of documents will be considered, therefore, solely upon established criteria under the Federal Rules of Civil Procedure."

We agree with the district court in attaching great weight to the assessment of tax deficiencies, although we are now considering it in its bearing on good cause rather than as a basis for jurisdiction. When the Government is the moving party and has made a claim for tax deficiencies, it has elected, as in bringing an indictment in a criminal case, not to "leave the transactions in obscurity from which a trial will draw them, [but to] * * * expose them fully". United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503 (per Judge Learned Hand). "The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. *Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.*" United States v. Reynolds, 1953, 345 U.S. 1, 12, 73 S.Ct. 528, 535, 97 L.Ed. 727.

In discussing good cause in Frazier v. Phinney the court emphasized that the defendant had "refused even to discuss the matter or have a conference with [the plaintiffs] regarding the alleged tax deficiencies" and that "denial of production would unduly prejudice the preparation of plaintiffs' case and cause them hardship or injustice." That is not this case. Again it must be remembered that the District Director did not refuse to furnish the reports under a claim of absolute privilege. He asked only that discovery be deferred until a later and more appropriate time. There is nothing in the record to show that the taxpayer needed the information immediately or that he would have been prejudiced in his civil suit by a reasonable delay. As pointed out, the suit had been filed only recently, it was not on the trial docket and, in the normal course of events in the busy Eastern District of Texas, it was a long way from trial.

C. In concluding that on the facts the taxpayer failed to show good cause below, we are influenced by the scope of the order. The order requires the production for inspection and photographing of "any or all" revenue agents' reports pertaining to the basis for the deficiencies for the years 1954, 1955, 1956, and 1957. The reports prepared as part of a criminal investigation would necessarily contain information of importance in a criminal prosecution that would have no necessary relation to the refund claim but could not be physically separated in the files.

Limited discovery and other remedies were available which would not be vulnerable to improper inspection. Thus, the plaintiffs were clearly entitled to discovery of any documents obtained from the plaintiffs' files. By interrogatories under Rule 33, the plaintiffs could learn the names and addresses of persons having knowledge of relevant facts. By depositions under Rule 26, they could ascertain relevant facts known to the agents. The rationale for discovery is "to escape from the sporting theory of litigation towards the principle of an open proceeding in which surprise is minimized and the opposing legal and

factual positions are fully clarified for the enlightenment of the decision-maker." [14] There could be no question of surprise as to the facts, because the taxpayer's right to a refund depended on financial records in his possession and facts within his knowledge. The taxpayer could be surprised only by a contention the Government might make based on the Agents' legal interpretation of the facts. This then was a case that cried for a pre-trial conference (a form of discovery). At such a conference the issues could be clarified, to avoid surprise, but there would be no necessity for the Government to produce the confidential reports. After the criminal case had progressed, there would still have been time for other pre-trial conferences, if needed, and a limited discovery, without the delay prejudicing the civil case.

Summarizing, in balancing the individual's right to prepare his case promptly against the public interest in withholding the full disclosure sought here, the following elements tip the scales in favor of the District Director: (1) discovery would give the taxpayer possession of reports denied him in the criminal proceeding; (2) there is reason to think, "to be honest about it", that the motion for discovery (if not the suit for refund) was for the purpose of obtaining the otherwise unobtainable reports; (3) the Government was not the moving party seeking to recover while withholding information that might defeat recovery; it assessed no deficiency and asserted no counterclaim; (4) the District Director did not claim an absolute privilege but asked only for a reasonable delay; (5) the record is bare of any showing that a reasonable delay would have prejudiced the taxpayer in the civil suit; (6) limited discovery by interrogatories and other remedies were available to the taxpayer; (7) the success of the taxpayer's suit depended on the truth or falsity of his own records and his knowledge of his own financial affairs; (8) the taxpayer filed a motion to dismiss with prejudice; (9)

that motion to dismiss, following the Director's notice to take the taxpayer's deposition, raises a fair inference that the taxpayer, instead of making the same full disclosure he was asking from the Government, intended to claim his privilege against self-incrimination. In short, the taxpayer failed to show good cause for the order of discovery issued in this case.

### III.

Right or wrong, the trial judge issued an order which the District Director declined to obey. The United States Attorney, however, acted under instructions from his superiors, made a good faith refusal, and respectfully explained his legal position to the Court. Notwithstanding the trial judge's indignation, therefore, we do not have before us a defiant litigant whose defiance, as an agent of the United States, is particularly irresponsible and ill-becoming.

Rule 37(b) provides the sanctions available when an order for discovery is disobeyed. In addition to an order based on contempt, the court may make such orders as are "just", including orders to: (1) take any fact as established for the purposes of the action; (2) refuse to allow the disobedient party to support or oppose designated claims or defenses; (3) strike out pleadings, dismiss the action, or render a judgment by default against the disobedient party; and (4) direct the arrest of the disobedient party. Under Rule 55(e) no default can be entered against the Government unless the claimant establishes his right to relief by satisfactory evidence.

The rules of law governing the interplay between Rule 55(e) and Rule 37(b) have not been firmly established. Rule 55(a), which sets the focus for other subsections of the Rule, provides for the entry of a default judgment against a party who "has failed to plead or otherwise defend as provided by these rules." The thrust of this section is directed to instances when a party by neglect or

14. Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1028 (1961).

inactivity has failed to prosecute or defend a suit. The suggestion that Rule 55(e) may be limited to cases of inaction is strengthened by its origin. The provision derives from Title 28, former Section 763 which set forth the duty of the United States district attorney to file an answer in suits against the government when the complaint was served on him. Section 763 provided: "Should the district attorney neglect or refuse to file the plea, answer, demurrer, or defense, as required, the plaintiff may proceed with the case under such rules as the court may adopt in the premises; but the plaintiff shall not have judgment or decree for his claim, or any part thereof, unless he shall establish the same by proof satisfactory to the court." The Third Circuit has declared that Rule 55(e) does not apply to cases where the Government has filed its answer and defended vigorously, but it took care to buttress its affirmance of judgment against the United States by pointing out that the trial court had not entered a true default judgment. Reynolds v. United States, 3 Cir., 1951, 192 F.2d 987, 998, rev'd on other grounds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727. On the other hand, Professor Moore finds that Rule 55(e) does restrict the sanctions provided by Rule 37(b) *when the litigant involved is the Government.* 4 Moore, Federal Practice § 37.04, 6 Moore, Federal Practice § 55.12 (2d ed., 1953). See also Jackson Buff Corporation v. Marcelle, E.D.N.Y., 1957, 20 F.R.D. 139; Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 988–89. While recognizing that Rule 55(e) limits Rule 37, Professor Moore provides an easy escape from the flat prohibition by asserting that a court could impose other sanctions against the Government under Rule 37 which would have the effect of establishing Government liability. Reynolds v. United States, supra; O'Neill v. United States, E.D.Pa., 1948, 79 F. Supp. 827, rev'd on other grounds, sub nom. Alltmont v. United States, 3 Cir., 1949, 174 F.2d 931. Such an interpretation provides the advantages of technical compliance without preventing the courts from enforcing their discovery orders.

Irrespective of the sweep of Rule 55(e) itself, we feel that its underlying policy reaches the instant case. The Rule rests on the rationale that the taxpayers at large should not be subjected to the cost of a judgment entered as a penalty against a government official which comes as a windfall to the individual litigant. The private party must first demonstrate that there is some basis on which he is entitled on the merits of his claim to receive judgment. A court should accord respect to this policy beyond the confines of Rule 55(e)'s strict coverage when it can do so without running against a countervailing consideration. The court took this position in O'Neill v. United States, supra. We agree with O'Neill. In the instant case the trial court's ruling did unnecessary violence to the policy against entering unsupported default judgments against the Government when it abruptly struck the Government's answer and entered judgment for the taxpayers at a hearing on a motion by the taxpayer for dismissal of his claim with prejudice. There is no shred of affirmative evidence in the record to support a recovery by the plaintiffs. In fact, on the record, there is a strong implication that the taxpayer, the District Director, the United States Attorney, and the trial judge himself recognized that the taxpayer *probably* owed more to the Government than the Government owed to him. In arguing for dismissal of his claim with prejudice the taxpayer virtually acknowledged that his purpose was to foreclose the Government from asserting any counterclaim. Since in final analysis the judgment was against the American taxpayers as a class, the plaintiffs should have been compelled to introduce their books, records, or some other evidence to show that they actually had suffered an operating loss; at the present we have only the plaintiffs' untested allegations as to the loss and its extent.

When the Government has refused to comply with discovery orders,

as a sanction under Rule 37, the court may declare as established particular matters of fact which the private litigant might have established through evidence obtained from the Government under the discovery procedures. Thus, in Reynolds v. United States, the widows of civilians killed in the crash of an Air Force plane were refused access to information concerning the crash. The court declared that the accident would be deemed to have resulted from the defendant's negligence. But it held a hearing to determine the extent of the widows' damages. Here, the plaintiffs did not show that they were dependent on information from the Government to prove their loss; they sought discovery for the purpose of anticipating collateral objections that the Government might raise. In some circumstances, in some cases, it might be an appropriate sanction under Rule 37 to prohibit the Government from raising collateral objections, but here the court should not have relieved the plaintiffs from proving those elements of their claim that were independent of the matters on which they sought discovery. Such a limit on the sanctions affords the Government a substantial protection against judgments on baseless claims. It is incumbent on a court under the spirit, if not the letter, of Rule 55(e) to extend this measure of protection to the public on whom will fall the ultimate burden of an adverse judgment.

Rule 37(b) provides a range of sanctions for the enforcement of discovery orders. And it vests discretion in the trial court in the selection of the particular sanction to use. This Court is reluctant to disturb an exercise of discretion by a trial judge, "but when we are convinced that the court below has exceeded a proper discretion in that the order imposed was too strict or was unnecessary under the circumstances, we would be remiss in our duties if we did not set that order aside." Syracuse Broadcasting Corp. v. Newhouse, 2 Cir., 1959, 271 F.2d 910, 915. In this case, we cannot escape the conclusion that the trial judge exceeded his judicial discretion in granting judgment for the plaintiff. He followed an unnecessarily broad discovery order with an undesirably stern sanction.[15] We believe that the ends of justice would best be served by remanding this case for a full trial on the merits. The civil suit should be given a second start. If the plaintiffs wish, they may submit a new motion for discovery. The merits of the motion will be unaffected by the complicating factor of a parallel criminal proceeding.

The judgment is reversed and remanded.

BELL, Circuit Judge (concurring specially).

I concur in the result only. My view is simply that the trial court abused its discretion under the facts in finding the necessary good cause for the production of the reports then in the criminal files of the United States attorney for use in the civil case. 4 Moore's Federal Practice (2nd ed.), § 34.04.

The criminal aspect of the matter could not be ignored. The end result

---

15. As Judge Waterman said recently in a thorough study, An Appellate Judge's Approach When Reviewing District Court Sanctions Imposed for the Purpose of Insuring Compliance with Pre-Trial Orders, 29 F.R.D. 191, 421, 425: "I * * * begin with the assumption that federal district judges are men of high purpose who exercise authority in the best interests of justice as they see it. If this were not so, the wide range of discretion that was left to district judges by the Rules would not have been left to them. * * * [However, the] sanctions of dismissal and of judgment by default are severe sanctions, and appellate judges believe they would be remiss in their duties if they chose only to rubber stamp such orders of lower courts. To be sure, these drastic sanctions are indeed provided for by the Rules, but I am certain that the draftsmen did not propose that they should be used liberally in order to eliminate the actual trial of case. ¶ I suggest that appellate judges believe that a district judge should approach with hesitation the use by him of dismissal sanctions. Where an alternative, less drastic, sanction would be just as effective it should be utilized."

was tantamount to allowing discovery under Federal Rules of Civil Procedure in a criminal proceeding, somthing we are powerless, as was the trial court, to authorize. The motion of the government to stay pending disposition of the criminal case should have been granted, and of course, all proceedings thereafter were nugatory.